Mariel P. WEBER, Maryann B. Smith, Sandra Rapp, Kathleen Mills, Barbara A. McCrossan, Marilyn Khan, Linda Stulz, Marcia W. Brown, and Katherine Fishelis

v.

SCHOOL DISTRICT OF PHILADEL-PHIA, Murray Bookbinder, Constance Clayton, Philadelphia Allied Action Committee, a/k/a Philadelphia Anti-Poverty Action Commission, Nate Williams, Philadelphia Federation of Teachers Local 3, American Federation of Teachers, AFL–CIO, Fred Digby, Joseph A. Califano, Jr., Secretary of Health, Education and Welfare, United States Department of Health, Education and Welfare.

Civ. A. No. 78–2350.

United States District Court,
E. D. Pennsylvania.

Feb. 27, 1979.

James R. Redeker, Jeffrey Ivan Pasek, Alan M. Lerner, Philadelphia, Pa., for plaintiffs.

Andrew M. Rosen, Philadelphia, Pa., for defendant School District of Philadelphia and Murray Bookbinder and Constance Clayton.

Agostino Cammisa, Asst. City Sol., Philadelphia, Pa., for defendant Philadelphia Anti-Poverty Action Comm. and Nate Williams.

Leonard M. Sagot, Thomas W. Jennings, Philadelphia, Pa., for defendant Philadelphia Federation of Teachers, Etc. and Fred Digby.

Alexander Ewing, Jr., Asst. U. S. Atty., Philadelphia, Pa., for defendant H. E. W. and Califano, Jr.

## OPINION

LUONGO, District Judge.

Under the Headstart—Follow Through Act,[1] Congress has authorized the Secretary of Health, Education and Welfare to designate and fund Headstart agencies in communities throughout the United States. 42 U.S.C. §§ 2928, 2928c (1976), *as amended by* Economic Opportunity Amendments of 1978, Pub.L. No. 95–568, §§ 10, 17, 92 Stat. 2430, 2439. Each Headstart agency then develops and administers a Headstart program aimed at providing "comprehensive health, nutritional, educational, social, and other services" to disadvantaged preschool children. 42 U.S.C. § 2928 (1976). The Headstart agency may also choose to delegate the responsibility for carrying out its Headstart program to one or more "delegate agencies." *See generally* 45 C.F.R. §§ 1303.1–1 to .2–1 (1977).

---

1. Pub.L. No. 93–644, § 8(a), 88 Stat. 2300 (1975), *as amended by* Economic Opportunity Amendments of 1978, Pub.L. No. 95–568, §§ 10, 17, 92 Stat. 2430, 2439.

Plaintiffs were formerly employed as Headstart teachers by one such "delegate agency": the School District of Philadelphia. The terms of their employment were governed by a collective bargaining agreement between the Board of Education of the School District of Philadelphia and the Philadelphia Federation of Teachers, which is the exclusive bargaining representative of teachers employed in the District's Headstart program. Although this two-year agreement provided that (so long as federal funding for the Headstart program continued) plaintiffs would remain in their teaching positions through the end of the 1977–78 fiscal year, the Board nevertheless, without a hearing, suspended plaintiffs without pay, effective June 30, 1977, for the stated reason that its general operating revenues had been reduced.

Plaintiffs filed this complaint on July 12, 1978, naming as defendants the School District (rather than the Board), two of its officers, the Philadelphia Allied Action Committee (PAAC), which is the federally-designated Headstart agency for Philadelphia, a PAAC employee, the Philadelphia Federation of Teachers (plaintiffs' bargaining agent), the Department of Health, Education and Welfare (HEW), the Secretary of HEW, and an HEW official responsible for, *inter alia*, the administration of the Headstart—Follow Through Act in the Philadelphia area. The complaint asserts claims under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985, 1986 (1976), the Headstart—Follow Through Act, 42 U.S.C. §§ 2921–2933 (1976), *as amended by* Economic Opportunity Amendments of 1978, Pub.L. No. 95–568, §§ 10, 17, 92 Stat. 2430, 2439, the HEW regulations applicable to Headstart programs, various provisions of the United States Constitution and the Pennsylvania Constitution, and—in count XII—other aspects of Pennsylvania law. Plaintiffs seek compensatory and punitive damages, as well as declaratory and injunctive relief. Jurisdiction is based on 28 U.S.C. §§ 1331, 1343, 1361 (1976), and on the doctrine of pendent jurisdiction.

Presently before me are motions filed by three groups of defendants. The School District defendants—the School District and its officers—argue that I should abstain from deciding the merits of plaintiffs' claims or, in the alternative, dismiss the complaint entirely. The Philadelphia Federation of Teachers (PFT) also seeks either abstention or dismissal of the complaint. Both the School District defendants and the PFT have relied on matters outside the pleadings in presenting their Rule 12(b)(6) motions, and so I shall treat those motions as motions for summary judgment under Rule 56. Fed.R.Civ.P. 12(b). Finally, the HEW defendants—HEW itself, the Secretary, and a regional HEW official—also seek either abstention or dismissal of the single count in which they are named. For the reasons set out in this opinion, I conclude that abstention is not warranted here, that plaintiffs lack standing to raise count I of the complaint, and that defendants' other motions should all be denied.

## FACTS

The facts in this case, viewed in the light most favorable to plaintiffs, are as follows. When plaintiffs were hired by the School District as teachers for the District's Headstart program, they each held a bachelor's degree from an accredited college or university. None of them, however, held a Pennsylvania teaching certificate, and the School District did not require such a certificate as a condition of employment in that program. Complaint ¶ 25. On April 11, 1977, the Board of Education of the School District of Philadelphia and the Philadelphia Federation of Teachers entered into a collective bargaining agreement that governed the terms and conditions of employment for Headstart teachers in the District's Headstart program. Exhibit E to Plaintiffs' Memorandum of Law (Document No. 10). By its terms, this agreement covered the two-year period from September 1, 1976 through August 31, 1978. This collective bargaining agreement did not require that Headstart teachers hold teaching certificates, but it specified that teachers who did hold such certificates would receive somewhat higher salaries than those who did

not. Complaint ¶¶ 28–29. The agreement also provided, as already noted, that plaintiffs would remain in their teaching positions through the end of the two-year period so long as federal funding for the Headstart program was not curtailed. As a result, "plaintiffs justifiably expected that they would continue to be employed as [Headstart] teachers during the fiscal year ending June 30, 1978." *Id.* ¶ 32.

Sometime in July of 1977, each plaintiff received a letter from defendant Bookbinder, the Executive Director of Personnel and Labor Relations for the School District, stating that she was suspended without pay, effective June 30, 1977, and stating further that plaintiffs' suspensions were "due to budget limitations in the 1977–78 General Fund Operating Budget [of the School District], and the resulting curtailment of the educational program." Exhibit A to Complaint. At that time, federal Headstart funds had not been reduced, and plaintiffs' positions had not been dropped from the School District's Categorical Fund Budget, but were instead filled by other persons. Complaint ¶¶ 34, 36. Plaintiffs were suspended, without any prior or subsequent hearing, pursuant to an agreement among the School District, Bookbinder, the PFT, and certain other defendants. Moreover, plaintiffs were suspended simply because they lacked teaching certificates; the significance of the certification issue will emerge shortly.

On September 19, 1977, the PFT instituted a grievance on plaintiffs' behalf. In the appropriate space on the grievance form, the PFT described the grievance as follows: "The Board improperly established separate seniority lists for certified and non-certified teachers with the Head Start Program and improperly utilized same for layoffs and recall." Exhibit A to PFT's Memorandum of Law (Document No. 11). On the same form, the PFT stated the desired remedy: "Certified and non-certified teachers with the Head Start Program shall be a single seniority list which shall be utilized for layoffs and recalls." *Id.* The School Board responded to plaintiffs' grievance on October 6, 1977, by stating in the appropriate

space on the grievance form: "When teachers are to be suspended under the tenure act, all non-certified teachers must properly be suspended without pay before the suspension of certified teachers." *Id.* The School Board, which had determined for financial reasons to suspend some certified teachers employed in various public schools within the district, apparently believed that it could not do so until it first suspended all its non-certified teachers, including those employed in supplemental programs such as Headstart. Plaintiffs' grievance was processed without success, and the matter was then submitted to arbitration.

In October of 1977, plaintiffs requested that Bookbinder and the School District supply them with certain information regarding the administration of the School District's Headstart program. This information related to the financial circumstances surrounding the decision to terminate plaintiffs. Although the Headstart—Follow Through Act requires "reasonable public access to books and records of . . . agencies engaged in [Headstart] program activities or operations," 42 U.S.C. § 2928f(a) (1976), neither Bookbinder nor the School District has "provided plaintiffs with the requested information or access to the books and records containing it." Complaint ¶ 41. Plaintiffs also sought to obtain from defendant Clayton, the Executive Director of Early Childhood Programs of the School District, certain other information bearing on the circumstances of their termination, but their request was again refused.

In December of 1977, plaintiffs' counsel supplied the PFT with a list of documents and materials that "plaintiffs believed necessary to properly prepare and present their grievances and offered to meet and discuss the issues to be raised at arbitration." *Id.* ¶ 49. Counsel for the PFT "replied that the PFT would not demand the information requested by plaintiffs and declined to meet with" plaintiffs' counsel. *Id.* Plaintiffs repeated their requests, but the PFT persisted in its position. Thus, the PFT "refused to obtain information from the School District . . . . necessary for proper presentation

of plaintiffs' grievances, refused to cooperate with plaintiffs' counsel in the exploration and presentation of issues involved in plaintiffs' grievances and in other ways failed to represent plaintiffs fairly and adequately." *Id.* ¶ 50.

In January of 1978, the School District and the PFT entered into an agreement in settlement of plaintiffs' grievances. Exhibit 4 to Exhibit A to Answer of Defendant PFT (Doc. No. 4). "This agreement was negotiated and executed without notice to or knowledge of the plaintiffs and their counsel by the PFT until at least February 17, 1978, when counsel for the plaintiffs contacted the PFT concerning it." *Id.* ¶ 51. Although the agreement provided for a unified seniority list for certified and non-certified Headstart teachers—the remedy originally sought in the grievance filed by the PFT—it denied plaintiffs "various valuable job rights," including back pay for the period during which they had been suspended. *Id.*

The agreement was expressly conditioned on the approval of the Commissioner of Basic Education of the Commonwealth of Pennsylvania. In a letter dated March 10, 1978, (Exhibit 7 to Exhibit A to Answer of Defendant PFT) the Commissioner refused to approve the agreement, stating that counsel for the School District had "made it clear" why the Commissioner's approval was being sought: the School District desired some assurance that it could include Headstart pupil attendance figures in its overall attendance reports—and thus obtain state education subsidies computed on the basis of higher attendance figures—without incurring the forfeitures usually imposed on school districts that employed uncertified teachers (such as plaintiffs). The Commissioner concluded: "I cannot approve the agreement because I cannot make such a guarantee." Following his refusal to approve the agreement, "the PFT refused to pursue" plaintiffs' grievances. Complaint ¶ 56. Although a hearing before an arbitrator had earlier been scheduled, it was never held.

In a letter dated March 23, 1978, another official in the Department of Education wrote to plaintiffs' counsel concerning the relationship between the federally-funded Headstart program and the certification requirements imposed by Pennsylvania law. He stated in part:

"The Bureau of Teacher Certification does issue an instructional certificate for Early Childhood Education. If a school district's pre-kindergarten program receives subsidy from the state, they must be staffed with properly certificated professionals. In the Philadelphia School District, pre-kindergarten programs do receive subsidy; therefore, Early Childhood Education certification is required.

Head Start programs, under the federal regulations, do not require certificated teachers. However, in order to obtain state subsidies the Philadelphia School District must comply with the School Code requirement to hire properly certificated professionals."

Exhibit 5 to Exhibit A to Answer of Defendant PFT.

Finally, on August 21, 1978, the PFT filed in the Commonwealth Court of Pennsylvania a petition for a declaratory judgment. Exhibit A to Answer of Defendant PFT. This petition, which included a stipulation covering many of the facts recited herein, specifically sought a declaration as to the validity under Pennsylvania law of the proposed agreement in settlement of plaintiffs' grievances. After some initial procedural skirmishes, the matter is now proceeding in Commonwealth Court as a petition for review of administrative agency action, based on facts as stipulated by the PFT, the Board of Education of the School District of Philadelphia, and the Department of Education of the Commonwealth of Pennsylvania. *See* Document No. 15. The litigation is currently pending under the caption: *Philadelphia Federation of Teachers v. Board of Education of the School District of Philadelphia*, No. 1965 C.D.1978.

## MOTIONS FOR ABSTENTION

Those defendants whose motions are pending all urge that I invoke the doctrine

enunciated in *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and abstain from deciding the merits of plaintiffs' constitutional claims. *See generally* Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine*, 122 U.Pa.L.Rev. 1071 (1974). In their briefs, the moving defendants discuss abstention only in connection with plaintiffs' principal constitutional claim, which is that their suspension without any opportunity to be heard deprived them of property without procedural due process. I shall therefore consider defendants' abstention arguments as addressed only to that claim.

Judge Garth recently restated the criteria governing application of the *Pullman* abstention doctrine:

"The special circumstances generally prerequisite to the application of this doctrine are threefold. First, there must be uncertain issues of state law underlying the federal constitutional claims brought in the federal court. Second, these state law issues must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law by the federal court would be disruptive of important state policies. In addressing an abstention claim, a district court must first consider whether the particular case falls within the ambit of *Pullman* as defined by these criteria, and must then make a discretionary determination, based on the weight of these criteria and other relevant factors, as to whether abstention is in fact appropriate."

*D'Iorio v. County of Delaware*, 592 F.2d 681, 685–686 (3d Cir. 1978).

■ In this case, more than in most, the *Pullman* doctrine is difficult to apply. It can safely be said that plaintiffs' procedural due process claim will turn on issues of state law, for they claim that they were each deprived of a "property" interest in continued employment, and "property" interests must be evaluated by reference to state law. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). However, the parties have referred in passing to several possible sources of plaintiffs' asserted "property" interest, and each of these possible sources would implicate somewhat different issues of state law. Defendants' briefs in support of abstention speak rather vaguely about unclear issues of state law, and they fail to analyze the precise state-law issues actually raised by plaintiffs' claim of a "property" interest. Too, once the proper source of their asserted "property" interest is selected, and the underlying state-law issues are identified, the difficulty common to all *Pullman* cases will arise: are the underlying state law issues sufficiently unclear to justify abstention? *See generally Frederick L. v. Thomas*, 557 F.2d 373, 383 & n.61 (3d Cir. 1977); Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine*, 122 U.Pa.L.Rev. 1071, 1088 (1974) ("There is little judicial analysis . . . of how unclear state law must be, though without resolving that question we know little indeed about the scope of abstention.") (footnotes omitted); *Developments in the Law—Section 1983 and Federalism*, 90 Harv.L.Rev. 1133, 1252–53 (1977). Finally, assuming that sufficient ambiguity exists in the state law, can it be said here (a) that one possible resolution of the state-law issues might obviate the need to reach the constitutional claim at all, or (b) that an erroneous reading of state law would be seriously disruptive of state programs or policies? These last questions are particularly difficult in view of the two most recent *Pullman* cases decided by the court of appeals. *Compare D'Iorio v. County of Delaware*, 592 F.2d 681, 691 & n.17 (3d Cir. 1978) *with McKnight v. SEPTA*, 583 F.2d 1229, 1241–42 (3d Cir. 1978).

■ One other feature of this case calls for a prefatory comment. In urging *Pullman* abstention here, the moving defendants contend that the (assertedly) unclear state-law issues will probably be resolved by the Commonwealth Court of Pennsylvania

in the litigation, mentioned earlier, now pending before that court. Their prediction may or may not prove accurate. But defendants are not simply asking for a stay of these proceedings until the Commonwealth Court renders a decision. *See generally* D. Currie, Federal Courts—Cases and Materials 680–82 (1975) (collecting authorities). Instead, defendants seek full-blown *Pullman* abstention, whereby I would postpone the exercise of jurisdiction over plaintiffs' constitutional claims until such time as they secure a state-court decision on the underlying state-law issues. Were I to enter such an order, and were the Commonwealth Court for some reason not to address the unclear issues that underlie plaintiffs' claims, then plaintiffs presumably would be obliged to commence another state-court action in order to secure the needed decision on those underlying issues. Accordingly, the *Pullman* analysis here should not be premised on defendants' confident prediction that the Commonwealth Court will resolve the state-law issues. A decision by that tribunal would certainly mitigate some of the harshness of an abstention order, were abstention otherwise justified, *see Frederick L. v. Thomas*, 557 F.2d 373, 384 (3d Cir. 1977) (dictum), but the mere prospect of such a decision cannot suffice to justify abstention in the first instance.

I turn now to plaintiffs' procedural due process claim. Plaintiffs mention three possible sources of their asserted "property" interest in continued employment: (1) the Public School Code of 1949, Pa.Stat.Ann., tit. 24, §§ 1–101 to 27–2702 (Purdon 1962 & Supp.1978), (2) portions of the Headstart Policy Manual, which are reprinted at 45 C.F.R. § 1304, Appendix B (1977), and (3) their collective bargaining agreement with the School District. I shall focus only on the collective bargaining agreement, which at this early stage in the proceedings appears to be the most substantial basis for the asserted "property" interest.

Plaintiffs' reliance on their collective bargaining agreement implicates an underlying issue of state law, *i. e.*, whether the School District had the power to grant plaintiffs any expectation of continued employment.

If the collective bargaining agreement between the School District and the PFT represented an *ultra vires* act on the part of the School District, then it arguably could not confer any "property" interest on any of the plaintiffs. Defendants seem to suggest that the question whether the School District had the power to grant plaintiffs this "property" interest is sufficiently unclear to warrant abstention. I cannot agree.

Defendants rely on the rule articulated in *Scott v. Philadelphia Parking Authority*, 402 Pa. 151, 166 A.2d 278 (1960), and reaffirmed in *Mahoney v. Philadelphia Housing Authority*, 13 Pa.Cmwlth. 243, 320 A.2d 459 (1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822 (1975). In *Scott*, the Supreme Court of Pennsylvania held that the nontenured managing director of the Philadelphia Parking Authority was an at-will employee, subject to summary dismissal, even though he had entered into a three-year employment contract with the Authority. The court reasoned that the Authority, as a public employer, had the right to summarily dismiss any nontenured employee, and that, *absent specific statutory authorization*, it lacked the power to contractually "waive" that right. 402 Pa. at 154–58, 166 A.2d 278.

In 1970, however, the General Assembly of Pennsylvania passed the Public Employee Relations Act, Act No. 195, 1970 Pa.Laws 563 (codified at Pa.Stat.Ann., tit. 43, §§ 1101.101–.2301 (Purdon Supp.1978)). Section 101 of the Act declares "that it is the public policy of this Commonwealth . . . to promote orderly and constructive relationships between all public employers and their employe[e]s." Pa.Stat. Ann., tit. 43, § 1101.101. That section goes on to say that

"the General Assembly has determined that the overall policy may best be accomplished by (1) granting to public employe[e]s the right to organize and choose freely their representatives; (2) *requiring public employers to negotiate and bargain with employe[e] organizations repre-*

*senting public employe[e]s and to enter into written agreements evidencing the result of such bargaining*; and (3) establishing procedures to provide for the protection of the rights of the public employe[e], the public employer and the public at large."

*Id.* (emphasis supplied).

The balance of the Public Employee Relations Act (PERA) declares the right of public employees to organize and bargain collectively, *id.* § 1101.401, establishes procedures for the certification of employees' bargaining representatives, *id.* §§ 1101.-701–.706, defines numerous unfair labor practices, *id.* § 1101.1201, and authorizes the Pennsylvania Labor Relations Board to prevent or redress such unfair labor practices, *id.* §§ 1101.1301–1306.

The crucial question here is whether the passage of the PERA changed the rule announced in *Scott, supra,* at least with respect to plaintiffs. To state the issue more accurately: does the PERA authorize a public employer to enter into a collective bargaining agreement under which a nontenured public employee, who formerly (under *Scott*) was an at-will employee, acquires a contractual entitlement to employment for a specified period of time? Surprisingly, the Supreme Court of Pennsylvania has not yet had occasion to face this question, and, in that sense at least, the issue is not yet settled.

I do not believe, however, that this question is sufficiently unclear to warrant the invocation of *Pullman.* The obvious purpose of the PERA was to advance stability in public-sector labor relations through collective bargaining, and that purpose would scarcely be served if nontenured public employees covered by fixed-term collective bargaining agreements are still at-will employees, just as they were before the adoption of the PERA. Moreover, the Commonwealth Court of Pennsylvania recently held that "the PERA clearly contemplates that public employers may agree in a collective bargaining agreement to limit its [sic] otherwise unfettered power to dismiss employees at will." *Commonwealth*

*v. Franklin Township Mun. Sanitary Auth.,* —— Pa.Cmwlth. ——, ——, 395 A.2d 606, 608 (1978) (citation omitted). The court quite properly distinguished its earlier decision in *Mahoney v. Philadelphia Housing Authority,* 13 Pa.Cmwlth. 243, 320 A.2d 459 (1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822 (1975), which had affirmed the continued vitality of *Scott* despite the intervening enactment of the PERA. Mahoney, the employee in that case, was not even covered by a collective bargaining agreement, but rather sought to derive a "property" interest from a personnel policy that his employer—the Philadelphia Housing Authority—had unilaterally adopted. Thus, Mahoney's own claim obviously derived no support whatever from the PERA. *See Covert v. Redevelopment Authority,* 447 F.Supp. 270, 274–75 (M.D.Pa.1978) ("There is no indication that the legislature intended to change the previous law of Pennsylvania as it applies to public employees who are not included within collective bargaining agreements."). Accordingly, the *Mahoney* court did not have to decide whether a nontenured public employee could derive a "property" interest from a collective bargaining agreement authorized by the PERA. The *Franklin Township* court, on the other hand, has now answered that question in the affirmative.

In light of my conclusion that the state-law issue just discussed is not so unclear as to justify *Pullman* abstention, I need not go on to consider whether abstention here would serve either of the values generally thought to be furthered by the *Pullman* doctrine: avoiding needless interference with legitimate state programs and avoiding unnecessary decision of federal constitutional questions.

A second state-law issue underlies plaintiffs' asserted "property" interest. As I noted earlier, plaintiffs do not hold Pennsylvania teaching certificates. Yet several sections of the Public School Code of 1949 provide that teachers employed by local school districts shall hold teaching certificates. *See, e. g.,* Pa.Stat.Ann., tit. 24, §§ 12–1201 to –1202 & 12–1252 (Purdon

1962 & Supp.1978). If the School District ran afoul of the Public School Code by employing uncertified teachers in its Headstart program, then the collective bargaining agreement involved here is of questionable validity with respect to plaintiffs. *See also* Pa.Stat.Ann., tit. 43, § 1101.703 (Purdon Supp.1978) (prohibiting the implementation of any provision of a collective bargaining agreement "if the implementation of that provision would be in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania"). Furthermore, if the agreement is invalid, then plaintiffs' efforts to derive a "property" interest from that agreement also run into difficulty. For these reasons, defendants seem to suggest that the question whether the statutory certification requirements apply to Headstart teachers such as plaintiffs is itself an unclear issue

of state law that justifies invoking *Pullman* abstention here. I disagree.

Although the Pennsylvania courts apparently have not addressed this issue, the law is not all that unclear. Three separate sections of the Public School Code require teacher certification, and each one is expressly limited to persons who teach in the *public schools* of Pennsylvania.[2] While the term "public school" is nowhere defined in the Public School Code,[3] federally-funded Headstart programs such as the one conducted by the School District are limited to *preschool* children, and would thus appear *prima facia* to escape the certification requirements that govern public schools.[4] Now it might be that a Headstart program conducted in a public school building, or one conducted with the aid of state subsidies, would be treated as a "public school" for at least some purposes. In any event, defendants have pointed to nothing in the present record [5] that might justify reading "public

---

2. Section 1201 provides that "[o]nly those persons holding one of [several enumerated categories of] certificates shall be qualified to teach in the public schools of this Commonwealth." Pa.Stat.Ann., tit. 24, § 12–1201 (Purdon Supp. 1978).

  Section 1202 states in pertinent part that "[n]o teacher shall teach, in any public school, any branch which he has not been properly certificated to teach." *Id.* § 12–1202.

  Finally, section 1252 reads as follows: "No person shall teach in a public school in the Commonwealth unless he has met the certification requirements as established by the State Board of Education which are applicable to the institution where he is employed." *Id.* § 12–1252 (enacted in 1973).

3. *But cf.* 24 Pa.Cons. Stat.Ann. § 8102 (Purdon Supp.1978) (Public School Employees' Retirement Code) ("public school" defined as: "Any or all classes or schools within this Commonwealth conducted under the order and superintendence of the Department of Education including, but not limited to: . . . those classes financed wholly or in part by the Federal Government.").

4. At oral argument, counsel for the PFT relied on *Commonwealth, Department of Educ. v. Jersey Shore Area School Dist.*, 481 Pa. 356, 392 A.2d 1331 (1978), in support of the proposition that federally-funded programs administered by local school districts are subject to the Public School Code. But the *Jersey Shore* case held only that a *certified* teacher employed to

teach in a federally-funded elementary-school program acquires the same tenure rights under the Code as would a certified teacher teaching in a conventional public school program. The *Jersey Shore* court was not required to decide whether the federally-funded program involved there was itself a "public school" under the Code.

5. The PFT attached to its answer a copy of the stipulated facts originally submitted to the Commonwealth Court in support of its petition for a declaratory judgment. Exhibit A to Answer of Defendant PFT (Document No. 4). That document includes a stipulation that the School District has received some $500,000 per year in state subsidies "resulting from the operation of the [Headstart] program." *Id.* ¶ 11(d). The original factual stipulation has apparently been superseded by the factual stipulation recently submitted to the Commonwealth Court in support of PFT's petition for review of agency action. Document No. 15. This more recent stipulation, to which the Department of Education is also a party, makes no reference to state subsidies channelled to the School District's Headstart program. In any event, I have not treated either of these stipulations as part of the factual record in this litigation.

  In their complaint, plaintiffs allege that the School District "applied for and received money from the Department of Education of the Commonwealth of Pennsylvania for the [Headstart] program." Complaint ¶ 54. This falls so far short of an allegation that state subsidies were used to *operate* the School District's

school" so broadly as to include the School District's Headstart program. In the absence of such a record, the question whether the three statutory certification requirements set out in note 2, *supra* apply to plaintiffs seems insufficiently ambiguous to warrant abstention here.

A fourth statutory provision—section 2518 of the Public School Code—complements the three sections just considered. It provides in pertinent part that "any school district . . . that after July 1, 1966 . . . shall have in its employ any person in a teaching . . . capacity who has not been certificated for such position by the Department of Public Instruction . . . shall forfeit an amount equal to the minimum salary mandated by law for the position less the product of said salary and the aid ratio of the district." Pa.Stat. Ann., tit. 24, § 25–2518 (Purdon Supp.1978). This provision reduces the state education subsidies payable to any school district that employs uncertified teachers. Does it also deprive plaintiffs' collective bargaining agreement of any legal force? Once again, no Pennsylvania decisions address the question. I tend to think that section 2518 does not invalidate plaintiffs' collective bargaining agreement, for two different reasons. First, although section 2518 is not limited by its terms to "public schools," one might suppose that it must be read in conjunction with the other certification requirements discussed earlier, and that it therefore applies only where those requirements apply, *i. e.,* to teaching done in "public schools." Second, even if one reads section 2518 literally, it simply penalizes those school districts that do employ uncertified teachers, and it does not purport to invalidate all employment agreements involving such teachers. Again, as was the case with the other three certification requirements, I doubt that the law is sufficiently ambiguous to justify abstention.

I recognize, however, that the certification issue raised by these four provisions of the Public School Code is considerably less clear than the state-law issue considered earlier, *i. e.,* whether the PERA authorized the School District to grant plaintiffs an expectation of continued employment for a fixed period. Thus, rather than resting my decision solely on the insufficient unclarity of the certification issue, I deem it advisable to consider the other two *Pullman* criteria in this context. As the following discussion should demonstrate, a thorough *Pullman* analysis here reveals no compelling basis for abstention.

Once the district court determines that unclear state-law issues underlie the federal constitutional issues, the second prerequisite to *Pullman* abstention is that "these state law issues must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims." *D'Iorio v. County of Delaware,* 592 F.2d 681, 686 (3d Cir. 1978). Here, of course, we have the possibility that the state courts would rule that the certification requirements of the Public School Code *do* apply to teachers in the School District's Headstart program, and that the collective bargaining agreement on which plaintiffs rely was therefore inconsistent with the Public School Code. Such a ruling might well destroy plaintiffs' efforts to derive a "property" interest from their collective bargaining agreement. In short, such a state-court determination might mean that I would not have to determine whether plaintiffs' suspension deprived them of "property" without procedural due process. Thus, it would appear that the second *Pullman* prerequisite is satisfied here.

But the Third Circuit's most recent *Pullman* decisions raise doubts on this point, and some discussion of those decisions is necessary here.

### McKnight v. SEPTA

*McKnight* was a section 1983 action brought by a former special investigator

---

Headstart program that it affords no basis for bringing that program within the meaning of "public school" as that term is used in the Public School Code.

employed in SEPTA's security division. The complaint alleged, *inter alia*, that SEPTA had terminated McKnight's employment, thereby depriving him of "liberty" and "property" without due process of law. I granted defendants' motion to dismiss the complaint insofar as it rested on an asserted "liberty" interest claim, and I abstained from deciding "whether a SEPTA employee has a property interest in his job" under section 25(a) of the Metropolitan Transportation Authority Act of 1963, Pa.Stat.Ann., tit. 66, § 2025(a) (Purdon Supp.1978). *McKnight v. SEPTA*, 438 F.Supp. 813 (E.D. Pa.1977), *rev'd in part and remanded*, 583 F.2d 1229 (3d Cir. 1978). McKnight then appealed.

The court of appeals, in a panel opinion written by Judge Adams, reinstated McKnight's "liberty" claim and "strongly hinted that abstention was not appropriate." [6] In addressing the latter issue, the panel recognized that abstention might obviate the need to reach McKnight's procedural due process claim. To quote the panel opinion:

> "But the question whether summary dismissal of an employee who has a property interest . . . violates due process would not appear to be a difficult or novel one. Rather, it involves the application of settled principles to a clear fact pattern."
>
> 583 F.2d at 1241.

For this reason (and another reason that will be discussed shortly), the *McKnight* panel concluded that abstention would not "substantially implicate" the values underlying the *Pullman* doctrine. Indeed, the panel stated that abstention in this context would be "unwise," and it urged that I reconsider my abstention ruling on remand. *Id.* at 1242.

### D'Iorio v. County of Delaware

*D'Iorio* was a section 1983 action brought by a former detective employed by the District Attorney of the County of Delaware, Pennsylvania. D'Iorio argued that, under the county's home rule charter, his employment could be terminated only by the Council of the County of Delaware. He alleged that the District Attorney, by firing him, had (1) arbitrarily violated the home rule charter so as to deny him due process of law, and (2) deprived him of both "liberty" and "property" without procedural due process. Defendants urged *Pullman* abstention, but the district judge found no unclear state-law issues "because the requirement that there must be Council action in order to discharge plaintiff is clear on the face of the Charter." 447 F.Supp. 229, 240 (E.D.Pa.1978), *rev'd*, 592 F.2d 681 (3d Cir. 1978). The district judge then decided only the arbitrariness claim, ruling that defendants had denied D'Iorio due process by arbitrarily violating the county charter. 447 F.Supp. at 240–42. Defendants then appealed.

The court of appeals, in a panel opinion written by Judge Garth, ruled "that the district court should have abstained in this case and should not have addressed the merits of any constitutional issues." 592 F.2d at 684. In explaining its conclusion, the panel noted that *Pullman* abstention might well have obviated the need to reach any of D'Iorio's constitutional claims. It did not go on to consider whether the constitutional questions that might have been avoided through abstention were either difficult or sensitive. It seems clear, though, that the constitutional questions raised by D'Iorio were neither difficult nor sensitive. First of all, the district judge had little difficulty resolving the arbitrariness claim in D'Iorio's favor, 447 F.Supp. at 240–42, and the court of appeals noted in passing that the district judge had "relied on a well established line of cases" in reaching his decision. 592 F.2d at 685 n.2. Moreover, D'Iorio's procedural due process claim was surely no more difficult or sensitive than the procedural due process claim that had been presented in *McKnight*.

In short, the *McKnight* panel strongly suggested that *Pullman* abstention should not be invoked to avoid a constitutional

---

6.  *D'Iorio v. County of Delaware*, 592 F.2d 601, 690 n.16 (3d Cir. 1978).

question that is neither difficult nor sensitive. The *D'Iorio* panel, on the other hand, squarely held that the district court erred by declining to abstain, although the constitutional questions that could have been avoided through abstention were neither difficult nor sensitive.

Given the confused state of the law in this circuit, caution dictates that I follow the approach taken in *McKnight*. When plaintiffs' procedural due process claim is examined in light of the *McKnight* opinion, one readily concludes that the constitutional question presented here is neither difficult nor particularly sensitive. *See generally* Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine*, 122 U.Pa.L.Rev. 1071, 1098, 1100–01 (1974). Rather, the question "involves the application of settled principles to a clear fact pattern." *McKnight v. SEPTA, supra,* 583 F.2d at 1241. In resolving that question, I would first apply the three-factor balancing test set out in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to determine what procedures, if any, were constitutionally mandated here. I would then ascertain whether plaintiffs were in fact afforded the required procedures. Quite clearly, this procedural due process analysis would raise no difficult or sensitive constitutional issues. Thus, although Supreme Court authority exists for abstaining in order to avoid deciding a procedural due process question, *see Boehning v. Indiana State Employees Ass'n, Inc.,* 423 U.S. 6, 96 S.Ct. 168, 46 L.Ed.2d 148 (1975) (per curiam), *McKnight* leads me to conclude that abstention here would serve only modestly the policy of avoiding unnecessary constitutional decisions.

This brings me to the third *Pullman* criterion: would "an erroneous decision of state law by the federal court [disrupt] important state policies"? *D'Iorio v. County of Delaware,* 592 F.2d 681, 686 (3d Cir. 1978). I tend to think that it would not, but I believe that some remarks by way of explanation are needed. *See generally id.* at 686.

In assessing the disruptive effect on state policies of an erroneous federal-court ruling on state law, a district court will usually be able to perceive the relevant state policies and to predict the disruption that would result from a particular erroneous decision. In some cases, the district court may also be able to predict the ease with which state officials can "correct" that erroneous decision and remove the cloud from the state policies. The difficult question raised by the last consideration is this: where a district court considering abstention believes that the appropriate state officials could probably "correct" the erroneous federal-court ruling before state policies were irreparably harmed, what weight should that receive in the district court's overall assessment of the disruptive effect of an erroneous ruling? Once again, *McKnight* and *D'Iorio* suggest strikingly different answers.

The *McKnight* panel, as I noted earlier, saw little reason for abstention with respect to McKnight's claim that he had been deprived of "property" without procedural due process. In addressing the abstention issue, the panel considered the potential disruptive effect of an erroneous district-court ruling that section 25(a) of the Metropolitan Transportation Authorities Act confers a "property" interest on SEPTA employees:

"[S]uch a determination would not upset sensitive state programs. The state would still be free to dismiss its employees; it would only have to afford them notice and an opportunity to be heard to the limited extent mandated by due process. *Should it find even these procedures to be too burdensome, the state through its legislature or courts would be free to amend or construe the statute and make explicit its intent that the employees would not be invested with a property right.* Since the court . . . would not be jeopardizing the implementation of state policies or restricting state prerogatives, abstention from a determination that § 25(a) of the Act establishes a property interest does not appear to be compelled by the values that justify abstention."

583 F.2d at 1241–42 (emphasis supplied, footnotes omitted).

The *D'Iorio* panel, on the other hand, held that abstention was required with respect to D'Iorio's constitutional claims. In explaining its ruling, the panel considered the potential disruptive effect of an erroneous district-court determination that only the Council of the County of Delaware could discharge county detectives:

"If the district court erred in concluding that the District Attorney lacked the authority to discharge county detectives, this would impose a significant cloud on the District Attorney's continuing ability to issue orders effectively and to maintain the necessary quality of staff and discipline within the criminal investigation division [where D'Iorio had been employed]. Also, reinstatement of D'Iorio might have the effect, as claimed by the District Attorney, of undermining the ability of county law enforcement officials to maintain the cooperation and confidence of other local, state, and federal law enforcement agencies."

592 F.2d at 691.

The *D'Iorio* panel also discussed the Second Class County Code, Pa.Stat.Ann., tit. 16, §§ 3101–6302 (Purdon 1956 & Supp. 1978), "which established the form of government in Delaware County prior to adoption of the Home Rule Charter." 592 F.2d at 688. In particular, the panel raised the possibility that certain provisions of the Second Class County Code remain in force notwithstanding the adoption of the Home Rule Charter, and so "continue to authorize the district attorney to discharge county detectives." *Id.* at 688. In this connection, the panel observed:

"[T]he district court's implicit determination that the applicability of various provisions of the Second Class County Code to Delaware County did not survive enactment of the Home Rule Charter might, if erroneous, prove disruptive of future attempts by county officials or county employees to rely on rights created by the general laws of Pennsylvania."

*Id.* at 691 (footnote omitted).

Thus, the *McKnight* panel found it significant that the state, acting either through its legislature or through its courts, would be able to "correct" the district court's erroneous reading of state law. The *D'Iorio* panel, on the other hand, ended its inquiry once it found that an erroneous district court ruling could seriously disrupt state policies; it did not address the question whether the appropriate state officials could readily "correct" that error. As I noted earlier, I shall follow the approach taken in *McKnight* until the court of appeals clarifies matters.

I turn now to an assessment of the disruptive potential of an erroneous ruling that the Headstart program involved here is not a "public school" and that the Public School Code therefore does not prevent a local school district from employing uncertified teachers in its Headstart program. To begin with, such a ruling obviously would not impair the legislative mandate that only certified persons may teach in the traditional public school system. Nor would it prevent the Commonwealth from imposing a subsidy forfeiture on any school district that employed uncertified teachers even in supplemental programs, such as Headstart programs, for section 2518 of the Public School Code, quoted *supra,* arguably authorizes such forfeitures. Rather, that ruling would simply permit local school districts to employ uncertified teachers in supplemental programs, such as Headstart programs, at the risk of suffering the forfeitures just mentioned. Moreover, the General Assembly of Pennsylvania could easily amend the statutory certification requirements, quoted in note 2, *supra,* to make clear its intent that local school districts employ only certified teachers even in supplemental programs such as Headstart programs. It is of course difficult to predict just how rapidly such an amendment might be enacted, but I see no reason to anticipate a sudden influx of uncertified teachers before the legislature could act. From the perspective of a local school district, uncertified teachers might be preferable to certified teachers because they often command slightly lower

salaries, but this financial incentive might well be offset by the prospect of state subsidy forfeitures. In short, the disruptive effect of an erroneous ruling on the certification issue would appear to be both slight and easily remediable.

Thus, my consideration of the three *Pullman* criteria reveals that (1) the teacher certification issue is somewhat unclear, (2) abstention on that issue might obviate the need to reach a procedural due process claim that is neither difficult nor particularly sensitive, and (3) an erroneous ruling on the teacher certification issue would disrupt only slightly the relevant state policy, and the legislature could easily remedy even that disruption. To put it somewhat differently, this case satisfies—but only barely—each of the three prerequisites to *Pullman* abstention.

Also to be considered here are the costs of abstention. Plaintiffs are likely to incur substantial expense and to experience considerable delay if I stay these proceedings and await a decision in the state courts. The pending litigation in the Commonwealth Court, to which plaintiffs are not parties, may or may not resolve the teacher certification issue; I know of no way to predict the likelihood that it will do so. In the event that it does, the Commonwealth Court's decision would unquestionably hasten the resolution of this civil action. In the event that it does not, however, plaintiffs presumably would be obliged to commence *another* state-court suit in order to procure a ruling on the certification issue. Moreover, if the state courts were ultimately to determine that the certification requirements do not apply to Headstart teachers, plaintiffs would then return to this forum and this litigation would be in essentially its present posture save for the passage of time.

■ In light of the foregoing discussion, I conclude that this is not a strong case for *Pullman* abstention. As one commentator has observed: "In view of the costs of abstention, it should be strictly limited to situations in which real harms are likely to result from federal exercise of jurisdiction

and in which deferring to state adjudication is likely to avert those harms." Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine,* 122 U.Pa.L.Rev. 1071, 1087–88 (1974). As matters now stand, I cannot say that this is one of those situations in which the benefits of abstention would clearly outweigh its costs. Accordingly, I shall enter an order denying defendants' motions to abstain.

As I have noted throughout my discussion of abstention, the law in this circuit is highly unsettled on several pertinent aspects of the *Pullman* doctrine. Under the circumstances, this could well be one of those rare cases appropriate for an interlocutory appeal, should one or more of the defendants be disposed so to move under 28 U.S.C. § 1292(b) (1976) as to the abstention issue. *See generally Katz v. Carte Blanche Corp.,* 496 F.2d 747, 752–56 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974).

## MOTIONS TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT

Before turning to a detailed consideration of defendants' various motions, some background information regarding the role of the Headstart Policy Committee may be helpful. Congress at first entrusted overall administration of the Headstart statute to the Director of Economic Opportunity, but in 1969 the Director delegated that responsibility to the Secretary of Health, Education and Welfare. *See, e. g., Economic Opportunity Comm'n of Nassau Cty., Inc. v. Weinberger,* 524 F.2d 393, 397 n.3 (2d Cir. 1975); H.R.Rep.No.93–1043, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 8043, 8054–55. Within HEW, the Office of Child Development assumed responsibility for the Headstart statute. In 1970, the Office of Child Development (OCD) issued detailed guidelines regarding parent involvement in all aspects of local Headstart programs. These guidelines took the form of revisions of Part B, section 2 of the Headstart policy Manual; they are reprinted at 45 C.F.R. Part 1304, Appendix B (1977). Under 45

C.F.R. § 1304.5–2(a) (1977), adopted by the Secretary in 1975, "all Head Start programs must comply [with the OCD guidelines] as a condition of being granted financial assistance."

The OCD guidelines called for the creation of three tiers of policy-making groups, corresponding to the three tiers of Headstart program administration. First, at the level of the federally-designated Headstart agency itself (PAAC, in this case), OCD described a Head Start Policy Council. Second, at the level of the delegate agency (the School District, in this case), the OCD guidelines called for a Head Start Policy Committee. Finally, at the level of the local Head Start center, OCD described a Head Start Center Committee. The middle group—the Head Start Policy Committee— is of particular importance in this case.

The OCD guidelines included two charts that carefully defined the make-up and the function of the Head Start Policy Committee. Chart A required that at least half of the Committee members be parents of children enrolled in the delegate agency's Headstart program, with the other members to be representatives of the community. Chart B gave the Committee varying degrees of control over particular policy decisions affecting the delegate agency's Headstart program. Notably, Chart B described the Committee's responsibility in (a) setting personnel policies at the delegate-agency level and in (b) hiring and firing the delegate agency's Headstart staff. With respect to each function—setting personnel policies and hiring and firing—Chart B required that the Committee "Must Approve or Disapprove." The OCD guidelines also defined "Must Approve or Disapprove" as used in Chart B:

> "The individual or group . . . must approve before the decision is finalized or action taken. The individual or group must also have been consulted in the decision making process prior to the point of seeking approval.
>
> If they do not approve, the proposal cannot be adopted, or the proposed action taken, until agreement is reached between the disagreeing groups or individuals."

Transmittal Notice, Head Start Policy Manual 70.2 at 10, *reprinted in* 45 C.F.R. Part 1304, Appendix B at 662 (1977).

Plaintiffs, of course, were employed by a delegate agency: the School District of Philadelphia. They allege that their termination was accomplished without the required approval of the Policy Committee, as specified in the OCD guidelines. They advance parallel arguments on this score. First, plaintiffs contend that the School District suspended them without the approval of the Policy Committee. In addition, however, plaintiffs contend that the School District, by deciding (based on its own interpretation of state law) to suspend all non-certified teachers, effectively adopted a personnel policy—*i. e.,* that certification would be a condition of employment— without the approval of the Policy Committee.

These allegations give rise to several distinct theories of recovery. In Count I of their complaint, plaintiffs allege that *all* defendants (excluding the HEW defendants) "have implemented new employment policies and practices regarding Head Start Teachers without having consulted and obtained prior approval from [the Policy Committee] in violation of [the Headstart— Follow Through Act]." In Count IX, plaintiffs allege that defendants PAAC (the federally-designated Headstart agency) and Williams (a PAAC employee), "[b]y participating and acquiescing in the actions of [the School District defendants] which violated [the Headstart—Follow Through Act] . . . failed to perform their administrative obligations" under the Act and the regulations. And, in Count VIII, plaintiffs allege that the HEW defendants "have failed to suspend or terminate financial assistance to PAAC and the School District of Philadelphia, and have failed to declare them ineligible to participate in the Head Start program, in violation of 42 U.S.C. § 2928f(a) and (c) and 45 C.F.R. § 1303.4–1 *et seq.*"

Count XIII of the complaint advances a tangentially related statutory claim. Plain-

tiffs here charge that the School District defendants (excluding defendant Clayton) and defendants PAAC and Williams "have denied plaintiffs their right of reasonable access to books and records of agencies engaged in Head Start program activities or operations in violation of section 8(a) of [the Headstart—Follow Through Act], 42 U.S.C. § 2928f(a)."

Having completed this survey of plaintiffs' claims under the Headstart statute and regulations, I turn now to a detailed consideration of defendants' motions, which concern these claims as well as plaintiffs' claims under the Civil Rights Act of 1871.

### Standing

The School District defendants and the HEW defendants argue broadly that plaintiffs lack standing to assert any claims under the Headstart statute or regulations.[7] They concede that plaintiffs allege economic "injury in fact" sufficient to satisfy the minimum article III requirements for standing. But defendants urge that plaintiffs fail to satisfy the "prudential" standing requirements applicable to statutory claims such as these. In short, they contend that plaintiffs' interests here are not even arguably within the zone of interests sought to be protected by the Headstart statute or regulations, and that the complaint should therefore be dismissed pursuant to Rule 12(b)(1).

I am unwilling to apply the "zone of interests" test[8] in such a sweeping fashion, however, for I believe it preferable to consider separately plaintiffs' standing to raise each of their various claims under the statute and the regulations. I shall evaluate defendants' arguments with respect to Counts I, IX, VIII, and XIII, in the same order in which those counts were discussed earlier.

Count I, as I already noted, is based entirely on defendants' conduct in firing plaintiffs and in implementing a new personnel policy without obtaining the required approval of the Policy Committee. Plaintiffs plead Count I as a claim arising under the Headstart *statute*, but they nowhere specify which provision of that statute assertedly requires compliance with the OCD guidelines that define the Policy Committee's responsibilities. In their briefs, moreover, plaintiffs treat Count I as a claim based solely on the OCD guidelines, particularly the chart providing that the Policy Committee "Must Approve or Disapprove" the adoption of personnel policies. As I pointed out earlier, an HEW regulation adopted in 1975 requires compliance with the OCD guidelines. *See* 45 C.F.R. § 1304.5–2(a) (1977). That regulation, in turn, was adopted pursuant to the Headstart statute. *See* 40 Fed.Reg. 27,562, 27,-567 (1975). But I fail to see how Count I can be read to assert a violation of the Headstart statute itself. Accordingly, for the purpose of determining the standing issue, I shall treat Count I as a claim based on the OCD guidelines and the 1975 HEW regulation that incorporated those guidelines. Proceeding in this fashion, I conclude that plaintiffs lack standing to bring this claim.

The inquiry here, it must be remembered, is whether plaintiffs' interest in continued employment with the School District's Headstart program is arguably within the zone of interests sought to be protected by either the OCD guidelines (including the chart referred to earlier) or the HEW regulation implementing those guidelines. Plaintiffs' assertion that they have standing here rests largely on certain provisions of the Headstart statute, provisions suggest-

---

7. Although the OCD guidelines themselves are not "regulations" in the usual sense, they are expressly incorporated by 45 C.F.R. § 1304.5–2 (1977) (adopted 1975).

8. For a good discussion of the "zone of interests" test and its numerous difficulties, see *Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130, 138–45 (D.C.Cir.1977), *cert. denied*, 434

U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Chief Judge Bazelon's dissenting opinion in *Tax Analysts* appears in the report of *American Soc'y of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 152–67 (D.C.Cir.1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978).

ing some congressional concern with the rights of persons employed in local Headstart programs. But plaintiffs cannot establish their standing to bring Count I except by reference to the zone of interests to which the OCD guidelines or the HEW regulation are directed.

Plaintiffs do contend that they come within the zone of interests envisioned by the OCD guidelines. Their argument is as follows:

"Proof that the administrative regulation which plaintiffs cited was designed to afford them protection can be inferred directly from the regulation itself. Among the personnel policies to be approved or disapproved by the Policy [Committee] are hiring and firing criteria for Head Start staff, career development plans and employee grievance procedures. A tipoff to the regulatory intent is provided by the inclusion of the phrase 'employee grievance procedures.' Such procedures can only be construed as intended to benefit the Head Start staff and to provide some guarantee of Due Process in any case of employment termination." Plaintiffs' Memorandum of Law (Document No. 8) at 15.

This argument is unconvincing. Chart B of the OCD guidelines does not impose any substantive requirements, such as the adoption of employee grievance procedures, on Headstart programs. Rather, it requires that the parents of Headstart children play a major part in making *whatever* substantive decisions affecting local programs are ultimately made. Thus, a delegate agency (such as the School District) might decide to adopt a grievance procedure that afforded its employees no meaningful protection, or it might decide to establish no grievance procedure at all. In either case, so long as each of the groups listed on Chart B was accorded its proper part in the decision-making process, both the letter and the spirit of the chart would have been satisfied. In short, the chart speaks only to who shall make certain decisions; it is quite silent with respect to what decisions shall be made. I therefore fail to see how the chart can be read as aimed at protecting the interests of Headstart staff members.

An examination of the entire chart provides some support for my interpretation. Chart B allocates responsibility for policy decisions in five broad areas: planning, general administration, personnel administration, grant application procedure, and program evaluation. It accords the Head Start Policy Committee an important voice in nearly every decision that is to be made at the level of the delegate agency. If Chart B did not exist, all these decisions probably would have been made by the delegate agency itself, through its directors or officers, with no parent involvement beyond that which the delegate agency chose to permit. I read Chart B as an effort to redistribute responsibility for a wide variety of decisions, including many decisions that affect Headstart personnel. But I see no evidence whatsoever that Chart B was designed to protect the interests of Headstart personnel.

I reach the same result with respect to the implementing regulation, set out at 45 C.F.R. § 1304.5–2(a) (1977). That regulation provides in pertinent part: "The basic parent participation policy of the Head Start program, with which all Head Start programs must comply as a condition of being granted financial assistance, is contained in [the 1970 OCD guidelines and charts, reprinted as Appendix B to Part 1304 of 45 C.F.R.]." Again, I see absolutely no basis for an argument that this regulation was aimed at protecting the interests of Headstart personnel.

■ For the reasons stated above, I conclude that plaintiffs lack standing to bring Count I of their complaint, which I have construed as a claim arising under the OCD guidelines and the HEW regulation just quoted. Accordingly, I shall dismiss Count I for lack of subject-matter jurisdiction.

Count IX, as I noted earlier, charges PAAC (the Headstart agency or "grantee agency") and Williams (one of its employees) with failing to perform their administrative responsibilities under the Headstart statute and regulations. No other defend-

ants are named in this count. Because neither PAAC nor Williams has filed a motion with this court, I am reluctant to resolve the standing question with respect to Count IX at this time, and I shall therefore proceed to a consideration of Count VIII.

Count VIII charges that the HEW defendants violated both the Headstart statute and the HEW regulations by failing to impose sanctions on PAAC (the grantee agency) or the School District (the delegate agency) for their respective acts in violation of the statute and the regulations. This count runs only against the HEW defendants. Those defendants, in turn, contend that plaintiffs lack standing to assert these claims, and that Count VIII should therefore be dismissed pursuant to Rule 12(b)(1).

Once again, analysis of the standing issue is hindered by the parties' failure to focus on the precise basis for each of plaintiffs' claims. In their complaint, plaintiffs specifically rest Count VIII on 42 U.S.C. § 2928f(a), (c) (1976) *as amended by* Economic Opportunity Amendments of 1978, Pub.L.No. 95–568, §§ 10, 17, 92 Stat. 2425, 2430, 2439, and on 45 C.F.R. §§ 1303.4–1 to –8 (1977). As I understand it, their legal theory here is that the Secretary violated his own regulations by continuing to fund PAAC and the School District after learning of the events alleged in the complaint. The HEW defendants then moved to dismiss, stating that the regulations cited in Count VIII, which govern suspension of funding of grantee agencies, "are clearly discretionary in their application . . . rather than compulsory as plaintiffs suggest." HEW Defendants' Memorandum (Document No. 7) at 7. In their reply brief, plaintiffs make two points. First, they seem to concede that the cited regulations are discretionary, and they charge that the Secretary's continued funding of PAAC here was an abuse of discretion reviewable under the Administrative Procedure Act. Second, they suggest that Count VIII could also be grounded in 42 U.S.C. §§ 2928, 2928b(b), 2928c(a) (1976), *as amended by* Economic Opportunity Amendments of 1978, Pub.L.No. 95–568, §§ 10, 17, 92 Stat. 2425, 2430, 2439. Their legal theory here

seems to be that PAAC, by reason of the events alleged in the complaint, ceased to satisfy certain statutory prerequisites to receipt of federal Headstart funding, so that the Secretary lacked authority to continue funding PAAC (and, indirectly, the School District).

■ Although matters may appear differently at some later stage of this litigation when the legal issues have been drawn into sharper focus, I am presently satisfied that plaintiffs possess standing to raise Count VIII against the HEW defendants. True, the Headstart statute was *primarily* aimed at furthering the interests of participating children and their families. *Cf. Economic Opportunity Comm'n of Nassau Cty. v. Weinberger*, 524 F.2d 393, 405 (2d Cir. 1975) (Friendly, J., concurring) ("The primary interest of Congress lay in the persons to be benefitted by the programs, not in those who were to administer them."). But the statute also has had "a readily foreseeable impact" on the interests of persons employed by agencies that administer Headstart programs. *American Soc'y of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 162 (D.C.Cir.1977) (Bazelon, C. J., dissenting), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978). I cannot with certainty say that the "zone of interests" test requires more in this context. Accordingly, I shall deny the HEW defendants' motion to dismiss Count VIII for lack of standing.

■ Finally, Count XIII of the complaint alleges that various defendants have denied plaintiffs their statutory right of access to various books and records pertaining to the operation of the School District's Headstart program. I understand the School District's argument about standing to apply to this count as well. Without belaboring the point, plaintiffs' interest in access is explicitly recognized and protected by the pertinent statutory provision, and I can see no substance to an argument that plaintiffs lack standing to raise Count XIII.

*Failure to State a Claim—Summary Judgment*

The moving defendants' Rule 12(b)(6) motions are largely unrelated, and I shall treat them separately. All but one of these motions were accompanied by materials that were not part of the pleadings, and I have therefore treated them as motions for summary judgment.

■ First, the HEW defendants move to dismiss count VIII of the complaint, which deals with their failure to impose sanctions on PAAC and the School District. The HEW defendants raise only one point in support of their motion: they contend that the Secretary has considerable discretion in determining what sanctions, if any, shall be imposed on grantee agencies. Plaintiffs seem to concede that the Secretary has considerable discretion in this area, but they oppose this motion on the ground that the Secretary's discretion alone is no answer to their legal theories. I agree that Count VIII cannot be dismissed at this time. Plaintiffs apparently contend, after all, (1) that the Secretary *abused* his discretion here, and (2) that the Secretary simply lacked statutory authority for his actions. Neither of these claims can be tossed aside simply by invoking the administrative agency's discretion. Accordingly, I shall deny the HEW defendants' motion to dismiss Count VIII.

■ Next, the School District defendants and the PFT all seek summary judgment on plaintiffs' procedural due process claims. They argue that plaintiffs were not entitled to pretermination hearings under the Public School Code, and they conclude from this that plaintiffs received all the process that was due them. Although this argument has some merit, it fails because it overlooks another basis for plaintiffs' asserted "property" interest—their collective bargaining agreement. Even if (as the moving defendants contend) plaintiffs could be summarily dismissed insofar as the Public School Code is concerned, that is no answer to plaintiffs' contention that the due process clause entitled them to some kind of hearing before their "property" interest in continued employment was taken away. Accordingly, I shall deny the motions for summary judgment on the due process aspects of the complaint.

Finally, the PFT seeks summary judgment in its favor on Count XII of the complaint. Count XII charges *the School District* with a breach of plaintiffs' collective bargaining agreement, and then continues: "By failing to adequately and fairly represent plaintiffs in processing their contractual grievances, the [PFT] breached its duty to fairly represent plaintiffs, thereby becoming jointly liable for the breach of plaintiffs' contractual rights." In its brief, the PFT addressed plaintiffs' alleged failure to exhaust certain intra-union remedies before seeking to litigate Count XII. Plaintiffs, in their reply brief, argued that exhaustion was not required here.

At oral argument, however, I asked counsel for both sides to brief an entirely separate issue, *i. e.,* whether Count XII, which appears to charge the PFT with an unfair labor practice, comes within the exclusive jurisdiction of the Pennsylvania Labor Relations Board. It was my view that an affirmative answer to this question would obviate any need to reach the exhaustion issue raised by the PFT. Counsel have submitted their briefs on the jurisdictional issue, and I shall consider that issue before reaching the exhaustion question.

In their reply brief, plaintiffs concede that the Pennsylvania Labor Relations Board has exclusive jurisdiction over an action seeking "redress of conduct which arguably constitutes one of the unfair labor practices listed in Article XII . . . of [the PERA]." *Hollinger v. Department of Public Welfare,* 469 Pa. 358, 361, 365 A.2d 1245, 1249 (1976) (citations omitted). Plaintiffs also seem to concede that where a public employees' union violates its duty of fair representation, it commits an unfair labor practice under section 1201(b)(3) of the PERA. *See Robinson v. Abington Education Ass'n,* 32 Pa.Cmwlth. 563, 379 A.2d 1371 (1977). Nevertheless, plaintiffs contend that Count XII of their complaint is properly before this court.

Plaintiffs reach this result by invoking an exception of the general rule of exclusive PLRB jurisdiction. They point out that the Supreme Court of Pennsylvania has twice recognized that "a suit for breach of contract in which the breach is also an unfair labor practice" falls outside the general rule just stated. *Building Service Employees Local 252 v. Schlesinger*, 440 Pa. 448, 452–53 n.3, 269 A.2d 894, 896 n.3 (1970) (dictum); *see Hollinger v. Department of Public Welfare*, 469 Pa. 358, 365 n.10, 365 A.2d 1245, 1249 n.10 (1976) (dictum). Relying on *Schlesinger* and *Hollinger*, plaintiffs now seek to characterize their claim against the PFT as a breach-of-contract claim brought by third-party beneficiaries. They argue that the PFT was obligated, under the collective bargaining agreement, to pursue their grievances, and that the PFT's actions in regard to those grievances amounted to a breach of this contractual undertaking.

■ One need only compare this argument with the language used in Count XII of the complaint, quoted *supra*, to recognize that plaintiffs have modified their theory of recovery against the PFT under Count XII. As originally pleaded, Count XII seemed to allege a breach of the PFT's statutory duty of fair representation, a duty imposed by the PERA itself. Plaintiffs now suggest, in order to avoid the jurisdictional difficulty just noted, that count XII alleges a breach of a duty imposed on the PFT by the collective bargaining agreement between the PFT and the School District. As I read the dicta in *Hollinger* and *Schlesinger*, plaintiffs may restate their claim in this fashion and thereby seek redress in court, rather than before the PLRB. But this "amendment" of Count XII should not be viewed as simply a correction of a technical pleading deficiency. Rather, any determination on the merits of plaintiffs' claim against the PFT will require an exceedingly careful analysis of Pennsylvania labor law, in order to properly define the duty of fair representation allegedly imposed on the PFT by virtue of the collective bargaining agreement.

■ I turn now to the PFT's contention that plaintiffs were required to exhaust various contractual and intra-union remedies before bringing Count XII of this action against the PFT. The PFT argues that it processed plaintiffs' grievance pursuant to the collective bargaining agreement, that it scheduled a hearing before an arbitrator, and that "prior to the arbitration hearing, the [PFT] and the [School District] entered into an agreement . . which, if approved, would [have reinstated plaintiffs] to their positions as Head Start teachers." PFT's Memorandum of Law (Document No. 11) at 2. As I noted earlier, the Pennsylvania Commissioner of Basic Education declined to approve the agreement, and the PFT took matters no further. It now contends that plaintiffs should have "appealed" its failure to pursue their grievance by taking an "appeal" to the rank-and-file membership of the PFT. But plaintiffs quite properly note that neither the collective bargaining agreement nor the proposed settlement agreement authorized an "appeal" to the PFT membership from the PFT's failure to pursue a grievance. Moreover, the PFT points to nothing in the PFT Constitution, attached as Exhibit B to its motion, that confers upon a dissatisfied member the right to present his problem to the full membership. Article VIII of the PFT Constitution suggests by implication[9] that at least some kinds of "internal disputes" may be taken up at "membership meetings," but I am reluctant to require exhaustion of a remedy whose very existence is at this point open to serious question. The PFT is of course free to renew its contention upon a showing that the in-

---

**9.** Article VIII of the PFT Constitution is titled "Internal Disputes," and it reads in its entirety as follows: "Appeals from a decision of the Executive Board or membership meeting of this organization may be taken to the body designated by the American Federation of Teachers for resolving its internal disputes."

tra-union remedy under discussion actually was available to plaintiffs.

The PFT's present motion is also based on plaintiffs' failure to exhaust their right of appeal to a tripartite arbitration panel established by the American Federation of Teachers (AFT), of which the PFT is a local affiliate. The operation of this arbitration procedure is described in an AFT pamphlet attached as Exhibit C to the PFT's motion. Once again, the very existence of this remedy is open to serious question. The AFT procedure clearly requires prior exhaustion of all remedies provided in the constitution of the local union, so that if plaintiffs had a right of appeal to the PFT membership, they would have had to take that appeal before they could secure review by the AFT arbitration panel. Moreover, the AFT arbitration procedure is available only where the local affiliate agrees to abide by that procedure; nothing in the present record suggests that the PFT either agreed or would have agreed to abide by that procedure. Once again, then, I shall reject the PFT's exhaustion argument at this time, leaving the PFT free to renew its contention upon a showing that the asserted remedy by way of arbitration actually was available to plaintiffs.

In short, treating all but one of the Rule 12(b)(6) motions as motions for summary judgment, I conclude that they should all be denied.

## OTHER MOTIONS

The School District defendants and the PFT urge that the Commonwealth of Pennsylvania is an indispensable party to this litigation, and that the complaint should therefore be dismissed pursuant to Rule 12(b)(7). Their arguments on this question are utterly unpersuasive, and I shall therefore deny the motions.

The School District defendants also seek an order striking certain paragraphs of the complaint. I recognize that some of these paragraphs are pertinent to Count I, which I have already dismissed for plaintiffs' lack of standing. On the other hand, some of these paragraphs may also be relevant to other counts of the complaint, so that an order striking them would plainly be premature. At the appropriate time, I will of course entertain a motion to strike factual averments in the complaint that relate only to a count or counts that have been dismissed. For the time being, I shall deny the School District's motion to strike.

## CONCLUSION

In summary, I shall dismiss Count I of the complaint due to plaintiffs' lack of standing. In all other respects, defendants' motion to abstain, motions to dismiss, motions for summary judgment, and motion to strike will be denied.